UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

RAYMOND CERILLI,                    :
          Plaintiff,                :
                                    :
     v.                             :          CASE NO. 3:08cv242 (SRU)
                                    :
M. JODI RELL, et al.,               :
          Defendants.               :

## RULING ON CROSS MOTIONS FOR SUMMARY JUDGMENT

On February 8, 2008, plaintiff Raymond Cerilli ("Cerilli") commenced this civil rights

action *pro se* alleging that the defendants were deliberately indifferent to his medical needs and

denied him access to the courts.  Cerilli is currently incarcerated at MacDougall-Walker

Correctional Institution ("MacDougall"), in Suffield, Connecticut.  On March 27, 2008, the court

held a hearing pursuant to 28 U.S.C. § 1915A, to permit Cerilli to identify his legal and factual

claims.  At the hearing, Cerilli clarified his claims of deliberate indifference to medical needs and

identified two new defendants, Captains John Patz and Steven Frey, who, Cerilli claims, denied

him access to the courts.

On July 8, 2008, the court granted Cerilli's request to add Patz and Frey as defendants

and to bring denial of access claims against them.  The order limited this case to those claims and

to the claims that Dr. Timothy Silvis, Dr. James Smyth, Dr. Thomas Thalody, Dr. Mark

Buchanan, and Health Service Administrator Richard Furey were deliberately indifferent to

Cerilli's skin condition, carpal tunnel syndrome, and cough, as well as his need for light-sensitive

eyeglasses and a partial lower denture.  The court dismissed the claims for money damages

against all defendants in their official capacities and all other claims against defendant Edward

Blanchette pursuant to 28 U.S.C. § 1915(e)(2)(B)(iii), the claims of verbal insults against all

defendants pursuant to 28 U.S.C. § 1915(e)(2)(B)(i), and all other claims against defendants

Theresa Lantz, Patricia Ottolini, Thomas Macura, Jodi Rell, Peter Murphy, Mary Johnson, and

John Does 1-99 pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).  (Doc. # 10.)

Thus, the only surviving claims are Cerilli's allegations against defendants Silvis, Smyth,

Thalody, Buchanan, Furey, Patz, and Frey.  Pending are cross motions for summary judgment.

For the reasons that follow, Cerilli's motion is denied and defendants' motion is granted in part

and denied in part.

## I.      Standard of Review

Summary judgment is appropriate when the evidence demonstrates that "there is no

genuine issue as to any material fact and that the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)

(plaintiff must present affirmative evidence in order to defeat a properly supported motion for

summary judgment).

When ruling on a summary judgment motion, the court must construe the facts in the

light most favorable to the nonmoving party and must resolve all ambiguities and draw all

reasonable inferences against the moving party.  *Anderson*, 477 U.S. at 255; *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398

U.S. 144, 158-59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d. 520, 523 (2d

Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the

nonmoving party").  When a motion for summary judgment is properly supported by

documentary and testimonial evidence, however, the nonmoving party may not rest upon the

mere allegations or denials of his pleadings, but must present sufficient probative evidence to establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992). If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249-50.

> The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Id.* at 247-48. To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248.

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. *Celotex*, 477 U.S. at 322. In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23; *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied if he can point to an absence of evidence to support an essential element of nonmoving party's claim). In short, if there is no genuine issue of material fact, summary

judgment may enter. *Celotex*, 477 U.S. at 323.

Where one party is proceeding *pro se*, the court reads the party's papers liberally and interprets them to raise the strongest arguments suggested therein. *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). Despite this liberal interpretation, however, a *pro se* party's unsupported assertions cannot overcome a properly supported motion for summary judgment. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991).

## II.    Background[1]

Cerilli is an inmate confined to the custody of the Connecticut Department of Correction pursuant to a sentence imposed on January 18, 1991. He has been incarcerated at MacDougall since 2003. Prior to 2003, a dermatologist diagnosed Cerilli as suffering from Lichen Planus, a skin condition; Department of Correction physicians have since treated Cerilli's condition with topical steroid creams.

In March 2004, an orthopedist at the University of Connecticut Health Center ("UCONN") examined Cerilli following his complaints of wrist pain. The orthopedist prescribed wrist braces to be worn by Cerilli. In May 2005, Dr. Silvis, who treated Cerilli during his incarceration at MacDougall, prescribed wrist braces for both wrists. In January 2006, Department of Correction staff confiscated the metal inserts from those wrist braces because of security concerns. Pursuant to the orders of Dr. Silvis, medical staff provided Cerilli with tongue depressors to be used in the wrist braces in place of the metal inserts. On March 23,

---

[1] The facts are taken from defendant's Local Rule 56(a)1 Statement and the attached exhibits and affidavits (docs. # 44 & # 46); Cerilli's Local Rule 56(a)2 Statement and attached exhibits (doc. # 72); the affidavits and exhibits accompanying Cerilli's motion for summary judgment (docs. # 62 & # 65); and affidavits and exhibits to the Complaint (doc. # 5).

2006, Dr. Silvis offered Cerilli replacement wrist braces made of plastic. Cerilli refused to try on the new wrist braces or accept them.

In November 2004, Cerilli filed a petition for writ of habeas corpus in the Connecticut Superior Court for the Judicial District of Tolland asserting claims that Drs. Silvis, Thalody and Smyth and had been deliberately indifferent to his carpal tunnel syndrome, ill-fitting dentures, damage to his eyes, broken nose, lumps in his neck and chest, back and leg pain, and deafness in his right ear. *See Cerilli v. Warden*, No. CV044000226S, 2006 WL 1828599 (Conn. Super. Ct. June 20, 2006). On June 20, 2006, after a hearing was held during which Cerilli and Dr. Edward Blanchette testified, a Superior Court Judge denied the petition with respect to all of the asserted medical claims because Cerilli had failed to prove that Drs. Silvis, Thalody, and Smyth had been deliberately indifferent to his serious medical conditions.

On April 6, 1998, Dr. Victor Shivy, D.D.S., delivered a full upper denture and a partial lower denture to Cerilli. Although Department of Correction/UCONN dental policy provides that an inmate may only receive new dentures every five years, Dr. Shivy delivered another full upper denture and partial lower denture to Cerilli on July14, 1999. In response to Cerilli's complaints that his dentures had been lost, Dr. Shivy delivered a third new full upper denture and partial lower denture to Cerilli on June 28, 2001. In January 2002, Dr. Shivy repaired Cerilli's upper denture. On July 12, 2004, Dr. Joann Tuttle, D.M.D., delivered a full upper and partial lower denture to Cerilli. Dr. Thomas Thalody, D.D.S. began treating Cerilli in May 2005. On October 13, 2005, Dr. Thalody delivered a new full upper denture to Cerilli.

Cerilli wears eyeglasses to correct problems with his vision. In 1992, Dr. James Smyth, a licensed optometrist, noted Cerilli's sensitivity to light and prescribed photo gray lenses for his

glasses. In 1997, another optometrist prescribed photo gray lenses for Cerilli. In 2004, Dr. Smyth provided Cerilli with one pair of photo gray glasses with a 30% tint and one pair of transitions glasses that darken in direct sunlight.

In August 2005, Cerilli filed a civil action in the Connecticut Superior Court for the Judicial District of Hartford against Attorneys Adam Laben and Jeffrey Minnier, Senior Assistant State's Attorney Linda Howe, and Governor Jodi Rell. *See Cerilli v. Laben*, HHD-CV05-4015033-S (Conn. Super. Ct. Aug. 2, 2005). The complaint in that case was not submitted with the cross motions for summary judgment, but it appears to be a matter concerning allegations of legal malpractice and not the conditions of Cerilli's confinement or the validity of his sentence and conviction. On April 10, 2006, a Connecticut Superior Court judge dismissed the complaint. On November 7, 2006, the Connecticut Appellate Court dismissed Cerilli's appeal of the dismissal of the civil action.

Dr. Mark Buchanan is a physician licensed to practice medicine in Connecticut. He has been the medical director of the University of Connecticut Correctional Managed Health Care ("CMHC") unit since May 2002, as well as a member of the Utilization Review Committee ("URC"). The URC reviews requests submitted by prison facility physcians for non-emergency, specialized medical treatment for inmates, including requests for non-formulary medications.

Richard Furey has been the Health Services Administrator at MacDougall since 2001. He is not a licensed physician, nurse, or other medical professional, and does not make treatment decisions.

### III.    Cerilli's Motion for Summary Judgment [Doc. #62]

Cerilli seeks entry of judgment in his favor on all claims. Local Civil Rule 56(a) requires

that a motion for summary judgment be accompanied by "a document entitled 'Local Rule 56(a)1 Statement,' which sets forth in separately numbered paragraphs meeting the requirements of Local Rule 56(a)3 a concise statement of each material fact as to which the moving party contends there is no genuine issue to be tried." Local Rule 56(a)3 requires that each statement in the Rule 56(a)1 Statement "must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial. The affidavits, deposition testimony, responses to discovery requests, or other documents containing such evidence shall be filed and served with the Local Rule 56(a)1 . . . Statement[]." This specific citation requirement applies to *pro se* litigants as well as to attorneys. Local Rule 56(a)4 also requires that the movant file a memorandum of law in support of his motion.

Cerilli has filed a memorandum and affidavit in support of his motion for summary judgment, but has not submitted a Local Rule 56(a)1 Statement. Thus, his motion for summary judgment is denied without prejudice for failure to comply with court rules. Nonetheless, the court considers the affidavit and supporting exhibits as if they were filed in opposition to the defendants' motion for summary judgment.

## IV. Defendants' Motion for Summary Judgment [Doc. #44]

Defendants move for summary judgment on five grounds. They argue that: (1) some of Cerilli's medical claims are barred by collateral estoppel; (2) defendants Buchanan, Silvis, and Smyth have not been deliberately indifferent to Cerilli's serious medical needs; (3) defendant Thalody has not been deliberately indifferent to Cerilli's serious dental needs; (4) defendant Furey was not deliberately indifferent to Cerilli's medical conditions or involved in the treatment of those conditions; (5) Cerilli has failed to exhaust his claim against defendant Patz; and (6)

defendant Frey did not deny Cerilli access to the courts.

### A.    Collateral Estoppel

Defendants first argue that Cerilli is barred by the doctrine of collateral estoppel from raising claims that were or could have been brought in a state habeas petition filed by Cerilli in 2004.  Cerilli does not address this argument.

Collateral estoppel, or issue preclusion,  provides that "'once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case.'" *Burgos*, 14 F.3d at 789 (quoting *Allen v. McCurry*, 449 U.S. 90, 94 (1980)).   The Second Circuit has applied collateral estoppel to bar relitigation in a federal section 1983 action of issues previously litigated in a state habeas proceeding.  *See Kulak v. City of New York*, 88 F.3d 63, 71-72 (2d Cir. 1996).  Whether collateral estoppel bars Cerilli's claim is governed by Connecticut law.  *Hoblock v. Albany County Bd. of Elections*, 422 F.3d 77, 93 (2d Cir. 2005).

Under Connecticut law, to be subject to collateral estoppel, an issue must have been: (1) "fully and fairly litigated," (2) "actually decided," (3) "necessary to the judgment," and (4) "identical" to the issue decided in the first action.  *Carnemolla v. Walsh*, 75 Conn. App. 319, 325 (2003) (quotation omitted).  In addition, Connecticut has abandoned the rule of mutuality, meaning that even parties who were not actually adverse to one another in the prior proceeding may nonetheless assert collateral estoppel.  *Aetna Cas. & Sur. Co. v. Jones*, 220 Conn. 285, 302 (1991).

In this action, Cerilli challenges the adequacy of medical care provided by defendants Dr. Silvis, Dr. Thalody, Dr. Smyth, Dr. Buchanan and Health Administrator Furey for his vision,

dental, and skin conditions, as well as his carpal tunnel syndrome and his cough. The state habeas petition filed by Cerilli in November 2004 includes the same claims regarding inadequate medical treatment for his poor vision, ill-fitting denture, and carpal tunnel syndrome. *Cerilli*, 2006 WL 1828599, at *1. The state court held a hearing on May 19, 2006, at which Cerilli's medical records were entered as evidence and Dr. Blanchette and Cerilli testified regarding medical and dental care provided by Drs. Silvis, Thalody, and Smyth. *Id.* at *2-*3. Cerilli was afforded an opportunity to question Dr. Blanchette regarding his testimony. On June 20, 2006, a state court judge denied the petition for writ of habeas corpus with respect to all of the medical claims raised in the petition because Cerilli "failed to prove that [Drs. Silvis, Thalody, and Smyth] had acted with 'deliberate indifference' to his medical needs." *Id.* at *4.

The court concludes that the claims raised in the complaint filed in this action pertaining to the medical care provided by Drs. Thalody, Smyth, and Silvis for Cerilli's vision and dental conditions and carpal tunnel syndrome are identical to the claims actually litigated in the state habeas petition. Furthermore, Cerilli was afforded a full and fair opportunity to litigate the medical issues in his state habeas petition. Accordingly, Cerilli is estopped from relitigating the claims that defendants Silvis, Thalody and Smyth were deliberately indifferent to his vision and dental problems and carpal tunnel syndrome prior to June 20, 2006.

The defendants' motion for summary judgment is granted on the ground that collateral estoppel bars the claims of deliberate indifference to Cerilli's vision and dental problems and carpal tunnel syndrome against defendants Silvis, Thalody, and Smyth for the time period prior the June 20, 2006. Cerilli's claims that those defendants were deliberately indifferent to his carpal tunnel syndrome, vision deficiency, and ill-fitting lower denture from June 20, 2006 until

the filing of the complaint on February 8, 2008 are addressed below.

### B.    Deliberate Indifference to Medical and Dental Needs

Defendants argue that they were not deliberately indifferent to Cerilli's vision problem, skin condition, carpal tunnel syndrome, or cough.  Cerilli contends that all of his medical conditions are serious and the defendants have intentionally failed to treat those conditions.

Deliberate indifference by prison officials to a prisoner's serious medical need constitutes cruel and unusual punishment in violation of the Eighth Amendment.  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  To prevail on a deliberate indifference claim, Cerilli must prove (1) that the defendants engaged in sufficiently harmful acts or omissions in response to Cerilli's serious medical needs, and (2) that the defendants intended either to deny or delay unreasonably access to needed medical care, or wantonly inflicted unnecessary pain.  *Wilson v. Seiter*, 501 U.S. 294, 298 (1991).  Thus, there are both objective and subjective components to the deliberate indifference standard.  *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994).  Objectively, the alleged deprivation must be "sufficiently serious."  *Id.*  A medical condition significantly affecting an inmate's daily activities or causing chronic and significant pain, or the existence of an injury a reasonable doctor would find important, constitutes a serious medical need.  *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998).  Defendants do not contest Cerilli's assertion that he suffered from a serious medical need with regard to his cough, skin condition, and carpal tunnel syndrome.  Thus, the court assumes, for purposes of deciding this motion, that the objective component of the standard has been satisfied by those medical conditions.  On the other hand, the defendants do contest whether Cerilli's vision and dental problems constituted serious medical needs.

Subjectively, the defendants must have been aware of a substantial risk that the inmate would suffer serious harm as a result of their actions or omissions. *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006). Not all lapses in prison medical care constitute a constitutional violation. Negligence will not support a section 1983 claim. *Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003). Nor will complaints about the exercise of medical judgment usually be sufficient to support an Eighth Amendment violation. *See Hernandez v. Keane*, 341 F.3d 137, 146-47 (2d Cir. 2003) (summary judgment appropriate where deliberate indifference claim relied on delay in providing risky treatment). Physicians can and do differ in their diagnoses and their determinations of the appropriate treatment for a particular patient, and the mere existence of a difference of opinion does not establish a claim of deliberate indifference. *See Estelle*, 429 U.S. at 107 (holding that questions of diagnosis and treatment implicating medical judgment are at most medical malpractice, and not deliberate indifference to serious medical needs). Thus, the fact that treating physicians considered two possible diagnoses does not establish that they were deliberately indifferent to the plaintiff's serious medical needs.

Further, Cerilli's own opinion that the defendants failed to provide proper medical care in insufficient to support his Eighth Amendment claim. Inmates are not entitled to the medical treatment of their choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986). A difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference. *See Hernandez*, 341 F.3d at 146-47 (holding that prisoner's disagreement with doctor's opinion regarding need for procedure was insufficient to support plaintiff's Eighth Amendment deliberate indifference claim). "So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to

an Eighth Amendment violation." *Chance*, 143 F.3d at 703.

### 1. Vision Problem

Cerilli asserts that he suffers from a condition that causes him to be sensitive to light. He claims that correctional officers confiscated his light-sensitive eyeglasses and Dr. Smyth has refused to provide him with replacement eyeglasses with the same dark tinting. Defendant Smyth contends that Cerilli has not met the objective prong of the Eighth Amendment standard because there is no evidence that he suffers from a serious eye condition requiring a prescription for eyeglasses with a tint darker than 30%.

In May 1991, Dr. Smyth prescribed photosun black eyeglasses for Cerilli. (Compl., Ex. 5.) Dr. Smyth avers that in 1992, he prescribed photo gray lenses for Cerilli because Cerilli suffered from flash burn which causes sensitivity to light. (Defs.' Local Rule 56(a)1 Statement, Ex. J, Smyth Aff. ¶ 6.) Dr. Smyth opined that his examinations of the Cerilli since 1992 revealed no permanent damage to his eyes from flash burn and that he no longer suffered from an abnormal sensitivity to light. (*Id.* ¶¶ 7-8.) During the course of treating the plaintiff, Dr. Smyth provided Cerilli with one pair of glasses tinted 30% and one pair of transitions glasses that darken in direct sunlight to accommodate Cerilli's complaints of sensitivity to light. (*Id.* ¶ 9.) Dr. Smyth has also treated Cerilli for a condition causing incomplete lid closure at night by prescribing ointment and artificial tears. (*Id.* ¶ 11.) In December 2008, Dr. Smyth examined Cerilli and opined that he did not have an vision condition requiring eyeglasses with a tint darker than 30%. (Defs.' Local Rule 56(a)1 Statement, Ex. C at 74.)

Cerilli contends that other optometrists have diagnosed him as suffering from light sensitivity and prescribed dark lenses to treat the condition. Attached as an exhibit to the

complaint is a prescription for Cerilli dated in 1997 and written by an optometrist, Dr. Alexander Clarke, for two pairs of eyeglasses, including a pair of photo gray lenses. (Compl., Ex. 5.) In April 1998, Cerilli filed a grievance that a Department of Correction employee had confiscated the light-sensitive eyeglasses that Dr. Clarke had prescribed for him. (Pl.'s Local Rule 56(a)2 Statement, Ex. A.) A medical supervisor responded that replacement eyeglasses had been provided to Cerilli in May 1998 and that Cerilli was not entitled to two pairs of glasses. (*Id.*) Cerilli has filed no other evidence that an eye doctor diagnosed him as suffering from a condition causing him to be sensitive to light and requiring him to wear light-sensitive eyeglasses with a tint darker than the glasses Dr. Smyth has prescribed for him since 1992. Thus, Cerilli has failed to demonstrate that he suffered from an objectively serious medical condition requiring that he wear light-sensitive glasses tinted more than 30% during the time period from June 20, 2006 until the filing of this action in February 2008. Moreover, because a simple difference of medical opinion is insufficient to prove that defendant Smyth was deliberately indifferent, Cerilli has failed to meet the second, subjective prong of the Eighth Amendment test. Accordingly, the motion for summary judgment is granted with respect to the claims against defendant Smyth.

### 2. Cough

Cerilli asserts that in 2007 and 2008, he could not stop coughing, was having trouble breathing, and at times coughed up blood. He claims that Dr. Silvis failed to diagnose and treat those symptoms. Defendants argue that, even if Cerilli's condition were objectively serious, Dr. Silvis was not deliberately indifferent to his condition.

Cerilli's medical records reflect that he first complained that he was coughing up green phlegm and was having trouble breathing in late July 2007. (Defs.' Local Rule 56(a)1 Statement,

Ex. C at 94.)   On July 31, 2007, Dr. Silvis issued an order that Cerilli undergo a chest x-ray and be started on two medications.  (*Id.* at 16.)  The chest x-ray was negative.  (*Id.* at 70.)  Over the next month, Dr. Silvis treated Cerilli's cough and chest congestion with antibiotics, ordered Cerilli to undergo two more chest x-rays, and sent Cerilli for blood work.  (*Id.* at 13-15, 42-46, 88, 92-93.)  The first x-ray revealed possible inflammation of a lung nodule.  (*Id.* at 67.)  The second x-ray reflected no evidence of pulmonary disease.  (*Id.* at 69.)

Dr. Silvis recommended a CT scan of Cerilli's chest to resolve the differences seen on the two chest x-rays and identify the cause of Cerilli's respiratory symptoms.  On August 31, 2007, Dr. Silvis submitted his request for a CT scan to the URC.  The URC denied the request on September 18, 2007.  (*Id.* at 26.)  The URC recommended that a chest x-ray be taken again in two months and that the on-site physician follow-up with tests regarding reports of pink-streaked sputum produced from Cerilli's coughing.  (*Id.* at 25.)  In response, Dr. Silvis ordered that lab work be performed and Cerilli undergo another chest x-ray.  (*Id.* at 12.)  The x-rays taken on September 19 and November 15, 2007 showed that Cerilli's lungs were clear.  (*Id.* at 66, 68.)

On December 5, 2007, Dr. Silvis examined Cerilli and observed no wheezing in Cerilli's lungs; Silvis noted that x-rays indicated that Cerilli's lungs were clear.  He suspected Cerilli suffered from bronchospasms and prescribed an Albuterol inhaler to be administered at a rate of two puffs, four times a day as needed for 60 days.  (*Id.* at 9, 85.)  On January 31, 2008, Cerilli complained again of constant coughing and shortness of breath.  A nurse diagnosed Cerilli as suffering from asthma and directed that the Albuterol inhaler continue to be administered at a rate of two puffs, four times a day as necessary.  (*Id.* at 4, 27-28, 82-84.)  In April 2008, Dr. Silvis ordered another chest x-ray and started Cerilli on an antibiotic.  The x-ray showed only a

few air bronchograms.  (*Id*. at 82.)  The medical records do not contain any other complaints of coughing or shortness of breath by Cerilli after April 2008.

Although Dr. Silvis may not have been able to definitively diagnose the cause of Cerilli's coughing, chest congestion, and shortness of breath, he examined Cerilli on a regular basis in response to his complaints, referred him for blood work and x-rays, submitted a request for a CT scan to the URC, and prescribed medication to treat the symptoms.  Cerilli has provided no evidence that Dr. Silvis was deliberately indifferent to his coughing, shortness of breath, and chest congestion symptoms during 2007 and 2008.  The motion for summary judgment is granted with respect to these claims.

### 3.    Carpal Tunnel Syndrome

Cerilli alleges that he has suffered from carpal tunnel syndrome in his wrists for years and that Dr. Silvis failed to provide him with wrist braces for the condition.  Cerilli's medical records reflect that on November 1, 2007, he made a request to a medic for new wrist braces because the old braces were broken and correctional officers had confiscated the tongue depressors from the old braces.  (*Id*. at 87.)   Cerilli did not bring the broken braces to the appointment or wait to be examined by the medic.  On November 9, 2007, Cerilli submitted an Inmate Request to Richard Furey asking that he be placed on the list to see a physician regarding his broken wrist braces, but it is not clear that the request was received by Richard Furey because it did not include a response. (Compl., Ex. 1.)  Dr. Silvis examined Cerilli on December 5, 2007, but Cerilli did not mention carpal tunnel syndrome or request replacement braces at that time.  (Defs.' Local Rule 56(a)1 Statement, Ex. C at 85.)  There are no other requests for replacement wrist splints or mention of pain or numbness from carpal tunnel syndrome until December 14, 2008.  On that date, a nurse

noted that Cerilli sought to be placed on light work duty due to his carpal tunnel syndrome and requested plastic inserts for his wrist braces. (*Id*. at 80.)

A different doctor examined Cerilli on December 24, 2008, diagnosed him as suffering from carpal tunnel syndrome, and recommended that he be placed on light work duty and wear wrist braces. (*Id*.) Cerilli made no specific request to Dr. Silvis concerning the need for new wrist braces until January 21, 2009. On that date, Dr. Silvis noted Cerilli's complaints of pain and tingling in his hands and opined that his examination revealed positive signs for carpal tunnel syndrome. He ordered that Cerilli's wrists be x-rayed and indicated that he would submit a request to the URC for an orthopaedic consultation at UCONN. (*Id*. at 63-64, 79.) The URC approved the request on February 13, 2009. (*Id*. at 23.)

Cerilli has failed to submit or offer any evidence suggesting that he fully alerted medical personnel about pain or numbness in his hands and wrists due to carpal tunnel syndrome between March 2006 and December 2008. Rather, the evidence shows that Cerilli either did not mention his ailment to physicians or made initial complaints without following up. Cerilli made no mention of pain and stiffness due to carpal tunnel syndrome to Dr. Silvis and did not request replacement wrist splints from him until January 2009, at which point Dr. Silvis ordered an X-ray examination and orthopaedic consultation. Dr. Silvis's conduct was not deliberately indifferent but was a reasonable response to Cerilli's complaints of pain in his wrists. The motion for summary judgment is granted with respect to this claim.

### 4. Skin Condition

Cerilli alleges that during 2007 and early 2008, Dr. Buchanan failed to provide him with Halog Cream, a topical steroid to treat his skin condition, Lichen Planus. Buchanan concedes that

Cerilli's skin condition is serious but argues that he was not deliberately indifferent to that condition.

Cerilli's medical records and exhibits to the complaint reflect that physicians had prescribed Halog Cream to treat Cerilli's Lichen Planus since at least 2003. (Compl., Exs. 6, 11.) Because Halog Cream is a non-formulary medication, prison facility physicians must seek approval of a prescription for the medication from the URC. Dr. Buchanan has been a member of the URC since May 2002. (Defs.' Local Rule 56(a)1 Statement, Ex. E, Buchanan Aff. ¶¶ 4-7.) In July 2006, Dr. Silvis prescribed Halog Cream to treat Cerilli's Lichen Planus and the URC approved the requested prescription. (Defs.' Local Rule 56(a)1 Statement, Ex. C at 21.) In January 2007, Dr. Silvis again prescribed Halog Cream to treat Cerilli's skin condition. (*Id.* at 19.) On April 10, 2007, the medical department learned that Halog Cream was not available due to a temporary company production problem, and a nurse prescribed a substitute medication, Triamcinolone, to treat Cerilli's skin condition. (*See id.*) On April 27, 2007, a nurse substituted Temovate, a generic version of Clobetasol, for Triamcinolone; Cerilli informed medical staff that Clobetasol did not work and caused his skin to peel, bleed and crack. (*Id.* at 95, 97.) Cerilli complained to Richard Furey, and Furey responded that the pharmacy did not have Halog Cream at that time, and Cerilli would have to use a substitute steroid cream. (*See* Compl., Ex. 11.)

On May 9, 2007, Dr. Silvis prescribed Halog Cream for Cerilli's Lichen Planus condition. (*See* Defs.' Local Rule 56(a)1 Statement, Ex. C at 17.) On May 16, 2007, Dr. Silvis learned from the pharmacy that Halog Cream could not be obtained. He noted that Cerilli would have to accept a substitute medication. (*Id.* at 17, 96.) In early June, Dr. Silvis informed Cerilli of these facts and prescribed Betamethasone for Cerilli's Lichen Planus because neither the Triamcinolone nor

the generic Clobetasol were working well.  Dr. Silvis directed the nurse to stop the Betamethasone when Halog Cream became available again.  (*Id.* at 95-96.)

On August 20, 2007, Dr. Silvis submitted a request to the URC for Halog Cream to treat Cerilli's Lichen Planus; by then, Halog Cream had become available to the medical department. (*Id.* at 89.)  There is no evidence that the URC or Dr. Buchanan, who was a member of the URC at that time, responded to the request.  On September 18, 2007, Dr. Silvis submitted a new request to the URC for Halog Cream to treat Cerilli's skin condition and noted that other steroid creams had failed to provide Cerilli relief.  In response to Dr. Buchanan's inquiry concerning the diagnosis, Dr. Silvis replied that the diagnosis was Lichen Planus.  (Defs.' Local Rule 56(a)1 Statement, Ex. C at 91.)  On September 19, 2007, Dr. Buchanan denied the request, but did not provide a reason for the denial.  (*Id.* at 90.)  On January 10, 2008, Dr. Silvis again submitted a request to the URC for Halog Cream to treat Cerill's Lichen Planus.  Dr. Buchanan denied the request and noted that Clobetasol and Betamethasone were similar in potency.  (*Id.* at 7.)  None of Dr. Silvis's requests had disclosed that Cerilli reacted negatively to alternative treatments.  On January 31, 2008, a nurse submitted a request to the URC for Halog Cream; that request stated that Cerilli had reacted negatively to Clobetasol.  (*Id.* at 8.)  Although there is no indication in Cerilli's medical records, Dr. Buchanan avers that he granted the request on January 31, 2008 and Dr. Buchanan's statement is not disputed.  (Defs.' Local Rule 56(a)1 Statement, Ex. E, Buchanan Aff. ¶ 10.)   In July 2008, Dr. Silvis prescribed Halog Cream to treat Cerilli's Lichen Planus and Cerilli's medication administration records reflect that he received the medication that month. (Cerilli Aff., Ex. 7; Defs.' Local Rule 56(a)1 Statement, Ex. C at 3.)

Cerilli contends that Halog Cream was always available and that Dr. Silvis and Furey lied

about its unavailability during the period from April to August 2007. In support of this contention, Cerilli states that at some point after October 2007, he learned that Ranbaxy Pharmaceuticals produced Halog Cream. (Pl.'s Local Rule 56(a)2 Statement, Ex. E.) He claims that, in response to an inquiry by one of his family members, a Ranbaxy representative indicated that the company had never stopped producing Halog Cream. (*Id.* ¶ 8.) That statement, however, is double hearsay that would be inadmissible in court and cannot be relied upon to create an issue of material fact. *See Beyah v. Coughlin*, 789 F.2d 986, 989 (2d Cir. 1986) ("Hearsay testimony that would not be admissible if testified to at trial may not properly be set forth in the Rule 56(e) affidavit." (quotation and alterations omitted)). Cerilli offers no other evidence and the medical records and other documents submitted in opposition to the defendants' motion for summary judgment do not suggest that defendants Silvis and Furey failed to tell the truth about the availability of Halog Cream from April through August 2007. The motion for summary judgment is granted with respect to the claim that defendants Silvis and Furey were deliberately indifferent to Cerilli's skin condition during the period from April to August 2007.

Cerilli also asserts that Dr. Buchanan's refusal to approve Dr. Silvis's requests for Halog Cream constituted deliberate indifference to his skin condition. There is no genuine issue of material fact with respect to whether Dr. Buchanan was deliberately indifferent to Cerilli's skin condition. Although Dr. Buchanan rejected the first several requests for Halog Cream, he was not informed of Cerilli's negative reaction to the alternative treatments until January 31, 2008. Once he became aware that Halog Cream was the only topical steroid that effectively relieved Cerilli's skin condition, he approved the medication. Dr. Buchanan's denial of Halog Cream does not rise to the level of *deliberate* indifference; indeed, at most Dr. Buchanan was negligent. The earlier

URC requests included no information about the ineffectiveness of Clobetasol and Betamethasone on Cerilli's Lichen Planus and Dr. Buchanan had no way to determine Cerilli's medical history from the bare URC requests. The defendants' motion for summary judgment is denied with respect to this claim against Dr. Buchanan.

## 5. Dental Needs

Cerilli alleges that Dr. Thalody failed to provide him with dentures that fit his bottom teeth properly. He claims that he was unable to eat and that the dentures cut his mouth. Defendant Thalody concedes that, although Cerilli's need for dentures is serious, the ill-fitting lower denture was not a serious medical problem requiring immediate treatment and he was not deliberately indifferent to Cerilli's dental condition.

Cerilli's dental records reflect that in June 2001, Dr. Victor Shivy, D.D.S., provided Cerilli with a new lower denture. (Defs.' Local Rule 56(a)1 Statement, Ex. D at 10.) On October 13, 2005, Dr. Thalody delivered a new full upper denture to Cerilli, and Cerilli signed for and accepted the denture. (*Id*. at 6, 12.) On December 6, 2006, Dr. Thalody examined Cerilli to investigate his complaints that a tooth was falling out of the upper denture, the lower denture had a broken clasp, and one of his fillings was loose. (*Id*. at 3.) Dr. Thalody opined that one tooth in the upper denture was chipped, but was not causing any impairment of Cerilli's ability to chew, and the loose filling was asymptomatic. In his patient notes, Dr. Thalody also observed that the damage to the dentures appeared to be the result of Cerilli's purposeful actions or reckless care, and that Cerilli was in possession of multiple pairs of dentures. (*Id.*) Cerilli, Dr. Thalody recorded, also kept his defective dentures even after receiving replacements. (*Id.*) Dr. Thalody concluded that none of Cerilli's complaints required urgent attention and scheduled Cerilli for

restoration of the loose filling and repair of the lower denture at a later date.  (*Id.*)

Dr. Thalody replaced the loose filling on January 9, 2007.  The dental records do not include any indication that Dr. Thalody repaired the lower denture on January 9, 2007 or any time thereafter.  (*See id*. at 1-3.)  In fact, there are no dental record entries for Cerilli for the period from January 10, 2007 until January 9, 2009.  (*See id*. at 2-3.)  On January 9, 2009, Dr. Philip P. McGeoghan, Jr., D.D.S., examined Cerilli and concluded that he required a new full upper denture and a new partial lower denture.  (*Id.*)  Dr. McGeoghan described the denture as "non-salvageable."  (*Id.*)

Cerilli has submitted an affidavit and other documents indicating that the broken and ill-fitting lower denture cut his mouth and made it difficult for him to eat.   Defendant Thalody has submitted evidence indicating that he was aware of the broken lower denture in December 2006, when he examined Cerilli, but did not present evidence that he repaired the broken lower denture at any time after January 2007.  Nonetheless, Dr. Thalody's patient notes indicate that, in his professional opinion, the damage to Cerilli's lower denture was not serious and did not require urgent attention, and there is no indication that, in January 2007, Cerilli's dentures were ill-fitting or cutting his mouth.  Furthermore, Dr. Thalody's notes and affidavit provide uncontradicted evidence that Cerilli was purposefully damaging his dentures in order to get new pairs and stockpile a personal denture collection.  Although evidence from 2009 shows that, at that point, a different dentist recommended a new set of dentures because the old set was "non-salvageable," that mere inconsistency of medical opinion – especially when that inconsistency reflects opinions separated by two years in time – is insufficient to sustain a deliberate indifference claim.  Indeed, it is unclear whether such an inconsistency in fact existed.  There is no showing that the dentures

Dr. McGeoghan recommended to be replaced were the same pair that Cerilli presented to Dr. Thalody or, if they were the same, that they were in the same condition that Dr. Thalody observed two years earlier.

For those reasons, the motion for summary judgment is granted with respect to Dr. Thalody's dental care.

### 6. Claims Against Defendant Furey

Defendant Furey argues that he has not been deliberately indifferent to Cerilli's various medical conditions. Furthermore, as a health administrator, he was not involved in the treatment decisions of other medical professionals.

Furey avers that he is not a doctor, a nurse, or other medical professional. He is not responsible for or involved in providing treatment or diagnosing inmates' medical conditions. Thus, he could not provide treatment for Cerilli's medical conditions. (Defs.' Local Rule 56(a)1 Statement, Ex. G, Furey Aff. ¶ 3.)

The exhibits to Cerilli's complaint are replete with Inmate Requests submitted by Cerilli to Furey during the period from 2004 to 2008. Those requests demonstrate that defendant Furey responded to Cerilli's many complaints regarding his medical conditions. (*See* Compl., Exs. 1, 2, 7, 8, 11.) Cerilli has submitted no evidence in opposition to the motion for summary judgment showing that defendant Furey ignored any requests for assistance by him. Thus, Cerilli has not met his burden in opposition to the motion for summary judgment of presenting evidence to demonstrate a genuine issue of material fact regarding defendant Furey's actions. The motion for summary judgment is granted with respect to all claims against defendant Furey.

### C. Denial of Access to Courts

Cerilli argues that both Captain Patz and Captain Frey denied him access to courts. I take up Cerilli's claims against Patz first.

### 1. Captain Patz

Cerilli alleges that Captain Patz denied him access to courts because he failed to send a box of medical records in support of a state habeas petition to the Connecticut Superior Court on October 18, 2005. Defendant Patz argues that Cerilli has failed to exhaust the administrative remedies available to him under the Department of Correction grievance procedures and, therefore, Patz is entitled to summary judgment.

The Prison Litigation Reform Act, 42 U.S.C. § 1997e(a), requires an inmate to exhaust "administrative remedies as are available" before bringing an "action . . . with respect to prison conditions." The Supreme Court has held that this provision requires an inmate to exhaust administrative remedies before filing any type of action in federal court concerning "prison life," *Porter v. Nussle*, 534 U.S. 516, 532 (2002), regardless whether the inmate may obtain the specific relief he desires through the administrative process, *Booth v. Churner*, 532 U.S. 731, 741 (2001). That requirement includes complying with all administrative procedural rules, including filing deadlines, for the inmate's issue to be reviewed on the merits. *Woodford v. Ngo*, 548 U.S. 81, 90, 93-95 (2006).

Defendant Patz argues that Cerilli failed to file any grievances during the period from October 2005 until February 2006 concerning the box of medical documents that Cerilli alleges were not mailed to Connecticut Superior Court on October 18, 2005. Cerilli avers that he did not become aware of Captain Patz's failure to mail the box of medical documents to the Connecticut Superior Court until a court clerk contacted him on or about November 30, 2006 to inform him

that there were no medical records in storage pertaining to his state habeas action. (Pl.'s Local Rule 56(a)2 Statement, Ex. F.) Thus, Cerilli's claim accrued on November 30, 2006, when he allegedly discovered that his medical documents never reached the Connecticut Superior Court. Attached as exhibits to Cerilli's complaint and affidavit are informal requests and grievances that he filed in November and December 2006 regarding Patz's failure to forward evidence to state court. (*Id.*) Accordingly, defendant Patz's motion for summary judgment is denied. The evidence shows that Cerilli did exhaust his administrative remedies concerning the claim that Patz failed to mail medical documents to the Connecticut Superior Court in October 2005.

### 2. Captain Frey

Cerilli alleges that in October and November 2006, Captain Frey refused to copy documents that he needed to submit to the Connecticut Appellate Court in connection with an appeal of a state civil action. On October 31, 2006 – approximately one week before the expiration of Cerilli's appeal period – Frey sent Cerilli a memorandum explaining the Department of Correction policy with respect to photocopying. (Defs.' Local Rule 56(a)1 Statement, Ex. M.) That memorandum related that photocopying services are available to prisoners and, moreover, in the event of "verified deadlines that cannot be met regarding the existing photocopy policy, the Unit Management staff will make exceptions and provide copying for inmates on a case by case basis." (*Id.*) Cerilli has not submitted evidence that he contacted Frey in order to obtain those photocopying services. Nonetheless, Cerilli alleges that the Connecticut Appellate Court dismissed his appeal because he did not submit the necessary documents, and that Frey's failure to make and send photocopies to state court denied him the right of access to the courts.

It is well settled that inmates have a First Amendment right of access to the courts. *See*

*Bounds v. Smith*, 430 U.S. 817, 828 (1977), *overruled in part by Lewis v. Casey*, 518 U.S. 343 (1996). To survive summary judgment, a plaintiff must present evidence showing that a defendant caused an "actual injury" by taking action or being responsible for actions that "hindered [plaintiff's] efforts to pursue a legal claim." *Lewis*, 518 U.S. at 351. Thus, actual injury pertains to the underlying claims that a plaintiff could have asserted if he had not been denied access to court. *See Christopher v. Harbury*, 536 U.S. 403, 415 (2002) (explaining that the right of meaningful access to the courts "is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court"). In *Lewis*, the Supreme Court cautioned that "the [actual] injury requirement is not satisfied by just any type of frustrated legal claim" but requires an arguable, non-frivolous claim. *Id.* at 353-54 & n.3.

In August 2005, Cerilli filed a civil action in the Connecticut Superior Court for the Judicial District of Hartford against Attorneys Adam Laben and Jeffrey Minnier, Senior Assistant State's Attorney Linda Howe and Governor Jodi Rell. *See Cerilli v. Laben, et al.*, HHD-CV05-4015033-S (Conn. Super. Ct. Aug. 2, 2005).[2] On April 10, 2006, a Connecticut Superior Court judge dismissed the complaint. *Id.*, doc. # 128. On October 11, 2006, Cerilli filed an appeal with the Connecticut Appellate Court. *Id.*, doc. # 129. Defendant Frey concedes that on November 7, 2006, the Connecticut Appellate Court dismissed Cerilli's appeal because Cerilli failed to file a preliminary statement of issues and designation of pleadings, a docketing statement, a draft judgment file, and a certificate regarding the transcript of the habeas proceeding. *See also id.*, doc. # 130 (entry of dismissal of appeal on November 7, 2006). Defendant Frey argues, however,

_____

[2] The court takes judicial notice of the docket sheet in that action which may be accessed via the following website: http://civilinquiry.jud.ct.gov.

that Cerilli did not suffer any injury as a result of the dismissal of the appeal because there is no evidence that the appeal had arguable merit or was non-frivolous.

Cerilli has not submitted a copy of the decision dismissing his malpractice complaint or a copy of the notice of appeal of the decision. Nor has he submitted an affidavit or another document describing the claims raised on appeal. Moreover, to the extent that Cerilli's civil action was one for legal malpractice, the Supreme Court has not included malpractice actions within the class of cases for which an inmate has a constitutional right of access to the courts and for which correctional officials must ensure court access. *See Lewis*, 518 U.S. at 354-55 (holding that, although prison officials must afford inmates access to courts to "attack their sentences," by filing direct appeals or by filing petitions for writ of habeas corpus in state and federal court, and to "challenge the conditions of their confinement," by filing civil rights actions under 42 U.S.C. § 1983, "[i]mpairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration"). Thus, Cerilli has not met his burden of demonstrating that the appeal included arguable or non-frivolous claims or was of the type that Captain Frey was required to provide him with affirmative assistance to pursue.

Cerilli has also not alleged that he was unable to or prevented from moving for an extension of time to file the necessary documents with the Connecticut Appellate Court prior to the November 7, 2006 dismissal of his appeal. *See* Conn. R. App. P. § 66-1 (setting forth rules for filing motions for extension of time). Cerilli was aware that Frey would not photocopy the documents for him before the time expired on his appeal. (Pl.'s Local Rule 56(a)2 Statement, Ex. F.) Exhibits submitted by Cerilli show that he filed an appeal to the Connecticut Appellate Court of a decision in another civil action on October 20, 2006 and sent certified mail to a number of

Connecticut agencies and courts during the time period before November 7, 2006. (*See* Cerilli Affs., Exs. F and G.) It was therefore within Cerilli's capacity to mail a motion for an extension of time to the Connecticut Appellate Court and, therefore, his right to access the courts was not denied. Nor has Cerilli explained why he made no attempt to file a motion to reopen or vacate the dismissal of the appeal once he was able to submit the necessary documents. Finally, Cerilli has not introduced any evidence explaining why he did not ask Frey for expedited copies after receiving the memorandum of October 31, 2006, in which Frey explained that the Department of Correction could provide copies in the event of a pressing court deadline, such as the one Cerilli then faced. (*See* Defs.' Local Rule 56(a)1 Statement, Ex. M.)

Because Cerilli has not provided evidence to show that the actions of defendant Frey impeded, hindered, or completely foreclosed any consideration of nonfrivolous or arguably meritorious claims on appeal, he has failed to satisfy the actual injury requirement of *Lewis*. The motion for summary judgment is granted with respect to the claims that Frey denied Cerilli access to the courts.

## V.    Conclusion

Cerilli's Motion for Summary Judgment [**Doc. No. 62**] is **DENIED** without prejudice for failure to comply with local court rules. Defendants' Motion for Summary Judgment [**Doc. No. 44**] is **GRANTED** with respect to all claims against defendants Silvis, Smyth, Buchanan, Thalody, Furey, and Frey; but is **DENIED** with respect to the claim that defendant Patz denied Cerilli access to courts when he failed to mail a box of medical documents to Connecticut Superior Court in October 2005.

It is so ordered.

Dated at Bridgeport, Connecticut, this 23rd day of September 2010.

/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge